TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
LAUREN RESTREPO (Cal. Bar No. 319873)
Assistant United States Attorney
National Security Division
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3825
Email: lauren.restrepo@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AHMED HOSSAM ELDIN ELBADAWY, et al.,<br><br>Defendants. | No. 24-CR-00595-JWH-5<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT TYLER ROBERT BUCHANAN<br><br>Hearing Date: October 1, 2026<br>Hearing Time: 10:00 a.m.<br>Location: Courtroom of the Hon. John W. Holcomb |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorney Lauren Restrepo, hereby files its Sentencing Position for defendant Tyler Robert Buchanan in the above-captioned case.

//

//

The Government's Sentencing Position is based upon the attached memorandum of points and authorities, the declaration and accompanying exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 17, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney

/s/
LAUREN RESTREPO
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I. INTRODUCTION.....................................................1

II. STATEMENT OF FACTS..............................................2

III. THE PRESENTENCE INVESTIGATION REPORT...........................6

A. 18-Level Enhancement for Loss Over $5 Million.............7

B. Two-Level Enhancement for Ten or More Victims.............7

C. Two-Level Enhancement Because Offense Involved Sophisticated Means........................................7

IV. GOVERNMENT’S SENTENCING RECOMMENDATION..........................8

A. The Nature, Circumstances, and Seriousness of the Offense, and the Need to Provide Just Punishment Warrant the Recommended Sentence..........................9

B. General and Specific Deterrence and the Need to Promote Respect for the Law Also Compel a Meaningful Custodial Sentence.......................................11

C. The History and Characteristics of Defendant Support the Government’s Recommended Sentence....................13

D. Restitution..............................................15

V. CONCLUSION......................................................15

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

For over a year and a half, defendant Tyler Robert Buchanan ("defendant") was a principal member of a cyber intrusion group responsible for breaching numerous major U.S. telecommunications companies, technology companies, business process outsourcing suppliers ("BPOs"), cloud communications providers, and cryptocurrency service providers, and targeting dozens more. The group was also responsible for hacking the cryptocurrency accounts of numerous individuals. The coordinated attacks resulted in significant financial loss to victims and the theft of large amounts of sensitive information from victim companies. For this conduct, defendant pleaded guilty, pursuant to a plea agreement, to one count of wire fraud conspiracy (18 U.S.C. § 1349) and one count of aggravated identity theft (18 U.S.C. § 1028A).

The U.S. Probation & Pretrial Services Office ("Probation") calculated defendant's advisory Guidelines range based on a Total Offense Level of 26 and Criminal History Category of I. However, we anticipate that defendant may be sentenced after November 1, 2026. The U.S. Sentencing Commission adopted amendments to the loss tables under U.S.S.G. § 2B1.1 in April 2026 and those amendments will take effect on November 1, 2026. If defendant is sentenced after November 1, 2026, the applicable sentencing calculation under U.S.S.G. § 2B1.1(b)(1) will be a loss exceeding $5 million but less than $15 million, corresponding to a +18 under U.S.S.G. § 2B1.1(b)(1)(J). This would result in a Total Offense Level of 24, and Criminal History Category of I, and a Guidelines range of 51-63 months.

Outside of this one possible change to the loss calculations under U.S.S.G. § 2B1.1(b)(1), the government agrees with Probation's calculation of the advisory Guidelines. For the reasons outlined below, the government respectfully requests that the Court sentence defendant to 87 months' imprisonment, consisting of 63 months' imprisonment on Count 1 and 24 months' imprisonment on Count 3, to be served consecutively, followed by three years of supervised release under the terms and conditions outlined in Probation's Recommendation Letter and the parties' plea agreement, and order defendant to pay the $200 special assessment.

## II. STATEMENT OF FACTS

From at least September 2021 through at least April 2023, defendant engaged in a sustained, highly sophisticated cyber intrusion and cryptocurrency theft conspiracy involving multiple co-conspirators.[1] As detailed in the plea agreement and paragraphs 16–37 of the Presentence Investigation Report ("PSR"), defendant was not a peripheral participant. He was a principal member in a coordinated criminal enterprise that executed technically advanced attacks on dozens of companies and numerous individuals across the United States. Over the course of more than a year, the group repeatedly breached protected computer systems of victim companies, stole sensitive non-public information, exploited that information to compromise dozens of victims' online accounts, and ultimately stole millions of dollars in cryptocurrency.

[1] Members of the group are commonly referred to by threat intelligence researchers as Scattered Spider. Scattered Spider is a loosely organized group, with specific clusters of the group sometimes working together on intrusions and thefts; defendant and his co-defendants were members of one such cluster.

Defendant played a critical role in this scheme. He coordinated phishing campaigns, conducted intrusions, administered a Telegram channel that served as a central clearinghouse for stolen credentials, and helped identify individuals to target for cryptocurrency theft. Like his co-conspirators, he also built and maintained online infrastructure to support the attacks and used stolen internal data from victim companies to identify additional victim accounts for cryptocurrency theft.

The conspiracy deliberately targeted telecommunications companies and BPO firms because of their access to sensitive customer information. By infiltrating these companies' systems, defendant and his co-defendants sought customer lists, employee credentials, and internal tools that could be leveraged for high-value account takeovers. They also focused on cryptocurrency exchanges and service providers in order to obtain lists of platform users -- particularly high net worth individuals. The group further targeted major video game companies to obtain proprietary data and personal information of users. Across all these sectors, defendants aggressively hunted for credentials and personal identifying information that could be sold or exploited in additional attacks.

Their methods were equally calculated and effective. The group sent SMS phishing messages to employees of victim companies, directing them to fraudulent login portals closely resembling legitimate sites. Many employees entered their credentials, unwittingly enabling defendants to use their login information to access their employers' internal computer systems. Defendants registered and managed numerous phishing domains to support these operations and ultimately targeted more than 45 companies nationwide.

Credentials harvested through these phishing sites were automatically routed to a Telegram channel administered by defendant and co-defendant Joel Evans. Through Telegram and other platforms, the defendants shared victims' usernames, passwords, and personal identifying information, circulated the credentials of high net worth targets, and strategized about how to compromise victims' accounts. In at least one instance, after breaching a victim company's computer system, defendant and co-defendant Ahmed Elbadawy copied an entire confidential database and attempted to sell the stolen data.

Once inside victim systems, the defendants extracted internal employee records, customer data, and system-access credentials. They used this stolen information to compromise the email and cryptocurrency exchange accounts of numerous individuals, causing devastating financial losses. Many victims lost hundreds of thousands of dollars; one victim lost more than $4 million. As reflected in the victim-impact statements filed under seal, for several victims the stolen cryptocurrency represented their life savings. After the thefts, many victims -- some of whom were in their 50s or older -- were forced to make drastic changes to their retirement plans because defendants wiped out funds they had spent decades accumulating. Others described profound anger, stress, and frustration, explaining that despite diligently securing their accounts, none of their precautions protected them from defendants' sophisticated attacks. One victim even hired a private cryptocurrency investigative firm in a desperate attempt to locate their stolen assets.

When Scottish authorities searched defendant's residence in April 2023, his devices contained sensitive non-public files from multiple victim companies, along with names and addresses of numerous

cryptocurrency theft victims. Investigators also recovered a text file containing seed phrases and login credentials for one victim's cryptocurrency account.

Despite clear law enforcement intervention, defendant appears to have continued committing phishing attacks and attempted intrusions. In May 2024 -- a full year after Scottish police searched his home and seized his devices -- defendant was arrested in Spain. Searches of the devices seized from him there revealed that, even after the April 2023 search, he persisted in researching new victims and attempting to breach additional companies. His conduct did not slow or pause. For example, in a Telegram exchange dated April 24, 2024, defendant and another user discussed creating new fraudulent phishing websites targeting employees of a victim company. (See Declaration of SSA Frederick and Exhibit A attached thereto.) In these messages, defendant also referenced using "evilginx," a publicly available phishing tool commonly used to bypass multi-factor authentication, demonstrating both his continued technical sophistication and his intent to circumvent safeguards designed to protect victims. In another Telegram exchange that same day, when asked by a different user "what are u even hacking [the Victim Company] for," defendant bluntly replied, "data." (See Declaration of SSA Frederick and Exhibit B attached thereto.) These communications make clear that defendant continued pursuing new victims, refining his methods, and expanding the scope of his criminal activity.

**III. THE PRESENTENCE INVESTIGATION REPORT**

On August 25, 2026, Probation disclosed the PSR and its Recommendation Letter. (Dkts. 193-194.) Probation calculated defendant's total offense level as 26, based on the following:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG §§ 2X1.1; 2B1.1(a)(1) |
| Specific Offense Characteristics: | | |
| Loss Amount More Than $9.5 But Less Than $25 million | +20 | USSG §§ 2B1.1(b)(1)(K) |
| 10 or more victims | +2 | USSG § 2B1.1(b)(2)(A) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(10)(C) |
| Acceptance of Responsibility: | -3 | USSG § 3E1.1(a)-(b) |
| Zero-Point Offender | -2 | USSG § 4C1.1(a)(1)-(11) |

The government agrees that Probation's Guidelines calculations are accurate. However, as noted above, we anticipate that defendant may be sentenced after November 1, 2026. The U.S. Sentencing Commission adopted amendments to the loss tables under U.S.S.G. § 2B1.1 in April 2026 and those amendments will take effect on November 1, 2026. If defendant is sentenced after November 1, 2026, the applicable sentencing calculation under U.S.S.G. § 2B1.1(b)(1) will be a loss exceeding $5 million but less than $15 million, corresponding to a +18 under U.S.S.G. § 2B1.1(b)(1)(J). This would result in a Total Offense Level of 24, and Criminal History Category of I, and a Guidelines range of 51-63 months.

Outside of this one change to the loss calculations under U.S.S.G. § 2B1.1(b)(1), the government agrees with Probation's calculation of the advisory Guidelines. The government respectfully requests that the Court adopt the factual findings and calculations

of the PSR and the additional factual information contained in this sentencing position.

**A. 18-Level Enhancement for Loss Over $5 Million**

Assuming defendant is sentenced after November 1, 2026, the government submits that an 18-level enhancement applies under U.S.S.G. § 2B1.1(b)(1)(J) because the loss amount was between $5 million and $15 million. Defendant admitted as part of his plea that he and the co-defendants conducted SMS phishing attacks against victim company employees and then used the fraudulently obtained credentials to steal additional victim account information that they then used to steal cryptocurrency worth at least $8 million. Here, as detailed in the PSR, the actual damages to four of the victim companies ($2,938,590) and the cryptocurrency stolen from 32 individual victims ($11,608,583.52) totaled $14,547,173.52. (PSR ¶¶ 35, 37, 45.) Accordingly, an 18-level increase under § 2B1.1(b)(1)(J) is appropriate.

**B. Two-Level Enhancement for Ten or More Victims**

The government concurs with Probation that a two-level enhancement applies under U.S.S.G. § 2B1.1(b)(2)(A) because the offense involved 10 or more victims. Here, as detailed in the PSR, there were at least 32 individual cryptocurrency theft victims and four victim companies who sustained over $14 million in actual loss in this case. (PSR ¶¶ 32, 35, 37.) Accordingly, the two-level increase is appropriate.

**C. Two-Level Enhancement Because Offense Involved Sophisticated Means**

The government concurs with Probation that a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) also applies because the

offense involved sophisticated means and defendant intentionally engaged in or caused the conduct constituting the sophisticated means. Application Note 9(B) defines the term "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Here, and as detailed in the PSR, the defendants' (i) highly coordinated and technically advanced scheme to gain unauthorized access to a dozen victim companies' computer systems; (ii) their unauthorized access to and theft from over two dozen individual victims' cryptocurrency accounts; and (iii) their creation and use of dozens of fake online accounts to hide their identities meet this standard. (See PSR ¶¶ 47-48.) Accordingly, a two-level increase is applicable under U.S.S.G. § 2B1.1(b)(10)(C).

**IV. GOVERNMENT'S SENTENCING RECOMMENDATION**

The government respectfully recommends that the Court sentence defendant to: (i) 87 months' imprisonment, consisting of 63 months' imprisonment on Count 1 and 24 months on Count 3, to be served consecutively; (ii) three years of supervised release under the terms and conditions outlined in Probation's Recommendation Letter and the parties' plea agreement; and (iii) a $200 mandatory special assessment.

For the reasons set forth below, the government believes its recommended sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a), namely, the nature and circumstances of the offense, the history and characteristics of defendant, the need for the sentence to reflect the seriousness of the offense, afford adequate deterrence to

criminal conduct, and avoid unwanted sentencing disparities among similarly situated defendants.

### A. The Nature, Circumstances, and Seriousness of the Offense, and the Need to Provide Just Punishment Warrant the Recommended Sentence

The nature and circumstances of the offense -- particularly the significant and deeply personal harm inflicted on individual victims -- are staggering and support a substantial sentence under Section 3553(a). For well over a year, defendant participated in a coordinated network intrusion and theft scheme that targeted dozens of companies and individuals. This was a sustained, calculated effort to penetrate protected company systems, harvest sensitive data, and convert that information into high value account compromises. The group exploited stolen information obtained through repeated intrusions into company networks, using it to access victims' online accounts and steal millions of dollars in cryptocurrency. Those thefts had severe, life-altering consequences for many victims and underscore both the seriousness and far-reaching impact of this conspiracy.

The circumstances of the offense also reveal persistent and repeated criminal conduct by defendant. With his co-defendants, he targeted and breached numerous company systems, extracting sensitive and nonpublic employee and customer information and weaponizing it to gain unauthorized access to personal accounts. Once inside, they stole substantial amounts of cryptocurrency and divided the proceeds among themselves. This pattern of conduct demonstrates a deliberate, ongoing exploitation of private systems designed to maximize financial gain at the expense of unsuspecting victims.

Defendant played a central role in the enterprise. He coordinated phishing campaigns, executed intrusions, administered the Telegram channel that received stolen credentials, and identified individuals to target for cryptocurrency theft. Alongside his co-defendants, he built and maintained critical infrastructure -- including domain names and virtual private servers -- that enabled the attacks. His contributions were essential to the conspiracy's success and directly facilitated the thefts that caused such profound harm.

Importantly, defendant's conduct did not stop even after direct law enforcement intervention. Despite Scottish authorities searching his home and seizing his electronic devices in April 2023, he continued his criminal activity unabated. When Spanish police arrested him in May 2024, the devices recovered showed that he had persisted in researching new victims and attempting to breach additional companies. His communications leave no doubt about his intentions. In a Telegram exchange dated April 24, 2024, defendant discussed creating new phishing sites to target employees at another victim company. When asked why he was "hacking [the victim company]," he responded simply that he was doing it for "data" -- signaling both motive and ongoing commitment to criminal activity. This continued offense conduct, occurring after he was confronted by law enforcement and after his devices were seized, sharply aggravates the nature and circumstances of the offense. It demonstrates not only sophistication and intent, but also a striking unwillingness to stop even when faced with serious legal consequences.

The emotional and financial devastation described in the victim impact statements further underscores the offense's seriousness. The

scale of the losses, the vulnerability of several victims, and the lasting consequences of the thefts demonstrate that this was an offense causing tremendous harm. These factors strongly support the imposition of a sentence that reflects the gravity of defendant's conduct.

**B. General and Specific Deterrence and the Need to Promote Respect for the Law Also Compel a Meaningful Custodial Sentence**

A meaningful term of imprisonment is also necessary to ensure adequate deterrence -- both specific and general -- against future criminal conduct. See 18 U.S.C. § 3553(a)(2)(B). Here, the Court should impose a sentence that deters this defendant from reoffending and sends a clear message to others engaged in cyber intrusions that such conduct will be met with substantial consequences. By his own admission, defendant and his co-defendants carried out cyber intrusions against at least a dozen companies and numerous individual victims, all for their personal financial gain. These offenses were technically sophisticated and required coordination, planning, and execution. And they were not isolated mistakes or impulsive decisions; defendant repeated these intrusions for well over a year. This pattern of deliberate, calculated conduct demands a sentence sufficient to deter both defendant and others from similar future crimes.

Moreover, the public's interest in deterrence is especially strong in cases like this, given the escalating costs of cybercrime, network intrusions, and cryptocurrency theft offenses that now enable criminals to steal vast amounts of sensitive, confidential information with a single click. In 2024 alone, the FBI's Internet Crime Complaint Center (IC3) received over 194,000 complaints related

to phishing schemes and SIM-swap attacks, with reported losses exceeding $95 million.[2] When complaints related to data breach incidents are included, reported losses in 2024 surpass $450 million. These figures underscore the massive and growing burden borne by victims, including companies forced to expend significant resources to assess the scope of a breach, remediate vulnerabilities, safeguard sensitive data, notify affected customers, and respond to federal and state regulatory obligations in the aftermath of an intrusion.

Moreover, the need for general deterrence is greatest in cases involving schemes that "may easily go undetected and unpunished." United States v. McQueen, 727 F.3d 1144, 1158–59 (11th Cir. 2013) (reversing lenient sentence because it "sap[ped] the goal of general deterrence," which is one of the "'key purposes of sentencing'"); see also United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010) (explaining that because tax evasion offenses are infrequently prosecuted, "[w]ithout a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path"). Investigating cyber intrusions, account takeovers, and cryptocurrency theft is inherently challenging. Law enforcement, victim companies, and individual victims must act quickly and collectively to gather and preserve digital evidence, analyze that data to identify those responsible, and ultimately locate and apprehend the perpetrators -- many of whom, like defendant, operate from outside the United States. Like the defendants in this case, cybercriminals increasingly rely on

[2] See, Federal Bureau of Investigation, 2024 Internet Crime Report, at 20-21, available at https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf

sophisticated tools and techniques to conceal their identities, and their infrastructure is often dispersed across multiple jurisdictions. As a result, the need to provide effective deterrence through meaningful sentences is particularly acute in cyber cases.

A custodial sentence sends a clear message that while the perceived likelihood of apprehension may be low, if apprehended the consequences of engaging in such conduct are significant. Conversely, an unduly lenient sentence would fail to dissuade others like defendant from committing similar crimes in the future.

### C. The History and Characteristics of Defendant Support the Government's Recommended Sentence

Defendant's history and characteristics present both mitigating and aggravating considerations under Section 3553(a). In mitigation, defendant was raised in a highly unstable home environment with a father who was physically and emotionally abusive. Despite these circumstances, he maintained acceptable grades and avoided behavioral issues at school -- a fact that reflects resilience and should be appropriately credited. Beginning at age twelve, he immersed himself in online communities after receiving his own laptop, a development that coincided with social anxiety, online gambling, and an unhealthy attachment to the online world. These issues almost certainly contributed to the offense conduct in this case and are relevant in assessing an individualized sentence. For these reasons, the government agrees that a sentence below the 120-month term of imprisonment imposed on co-defendant Noah Urban is appropriate.

But defendant's personal background does not excuse his choices. His conduct occurred over nearly two years and was not impulsive or an isolated lapse. Prior to engaging in this criminal activity,

defendant successfully graduated from high school and earned a computer science and game-development certificate, giving him both the skills and the educational foundation to pursue lawful employment. He continues to have a supportive relationship with his mother, who has stood by him throughout this case and financed his retained counsel. He is fortunate to have that support system, and his mother is deserving of commendation.

Yet despite these advantages, defendant has no employment history and chose instead to direct his considerable technical abilities toward far reaching and financially devastating cybercrimes. Even after law enforcement intervention in April 2023, he persisted. He did not reconsider his conduct; he did not obtain gainful employment; he continued researching new victims and attempting to hack additional companies until his eventual arrest in Spain a year later. This continued criminal activity after being searched by the police reflects a troubling lack of deterrability and a willingness to disregard the law even when confronted with its consequences. And although the government expects that most, if not all, of the victims will be made whole through funds seized from other co-defendants, defendant, who purportedly gambled away the proceeds of his crimes, has made no financial contribution whatsoever towards compensating any of the individuals whose lives he helped upend.

In sum, although defendant’s upbringing offers some mitigation for his conduct, his actions in this case were driven entirely by greed and a complete disregard for the harm inflicted on dozens of companies and individuals. His sustained criminal behavior, his refusal to stop even after law enforcement intervention, and his

failure to take any steps returning money to victims are all powerful indicators that his history and characteristics warrant a meaningful custodial sentence. For these reasons, the government submits that a sentence of 87 months imprisonment is appropriate.

**D. Restitution**

Pursuant to 18 U.S.C. § 3663A, restitution to victims is mandatory in this case. The Mandatory Victims Restitution Act also provides that "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." 18 U.S.C. § 3664(d)(5). The parties anticipate filing a stipulation related to restitution in this case in advance of defendant's sentencing. If that does not occur, the government will request that the Court set a restitution hearing after defendant's sentencing to determine the applicable restitution amounts due to victims.

**V. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 63 months' imprisonment on Count 1 and 24 months' imprisonment on Count 3, to be served consecutively; (ii) three years of supervised release under the terms and conditions outlined in Probation's Recommendation Letter and the parties' plea agreement; and (iii) a $200 mandatory special assessment.