SARA AZARI (SBN 237987)
LAW OFFICE OF SARA AZARI
849 S. Broadway, Suite 1107
Los Angeles, California 90014
Telephone: (213) 622-5000
Facsimile: (213) 254-0555
Email: sara@azarilaw.com

VICTOR SHERMAN (SBN 38483)
LAW OFFICES OF VICTOR SHERMAN
11400 W. Olympic Boulevard, Suite 1500
Los Angeles, California 90064
Telephone: (424) 371-5930
Facsimile (310) 392-9029
Email: victor@victorsherman.law

Attorneys for Defendant
TYLER BUCHANAN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>TYLER BUCHANAN,<br>Defendant. | Case No. 2:24-cr-00595-JWH<br>**DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS**<br>Date: October 1, 2026<br>Time: 10:00 a.m.<br>Court: Honorable John Holcomb |

Defendant TYLER BUCHANAN, by and through Sara Azari and Victor Sherman, his attorneys, hereby states his position regarding the Presentence Report and his upcoming sentencing.

///

///

///

Dated: September 17, 2026

Respectfully submitted,

LAW OFFICE OF SARA AZARI

By *<u>/s/Sara Azari</u>*
SARA AZARI
Attorney for Defendant
TYLER BUCHANAN

LAW OFFICES OF VICTOR SHERMAN

By *<u>/s/Victor Sherman</u>*
VICTOR SHERMAN
Attorney for Defendant
TYLER BUCHANAN

# I.

# OVERVIEW AND RECOMMENDED SENTENCE

Defendant Tyler Buchanan, a youthful first-time offender, has pleaded guilty to Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §1349 (Count 1) and Aggravated Identity Theft, Aiding and Abetting in violation of 18 U.S.C. §§1028A(a)(1); §2(a) (Count 3). On the latter count, the law requires a 2-year mandatory term of consecutive incarceration.

Tyler Buchanan is ashamed of his illegal behavior and accepts full responsibility for his involvement in this crime. He blames no one except himself. He advised undersigned counsel of his intent to plead guilty at an early juncture of these proceedings, and he has reiterated his regret at every turn.

The defense does not minimize the seriousness of this case. The victims sustained real financial losses, and those losses properly occupy a central place in the Court's consideration. But the gravity of the harm and the character of the person who caused it are distinct inquiries, and the record here separates them.

Tyler Buchanan brings no hardened background and no criminal orientation to this sentencing. He and several of his co-participants met in an online community of bored teenagers, drawn together into a virtual world of gaming and gambling that, over time, took on the character of an addiction. Whatever judgment and internal guardrails a young man of nineteen might otherwise have brought to bear were further eroded by his dependency on marijuana, Adderall, and other substances.

Tyler's trajectory is not idiosyncratic. A growing body of research examines young people for whom computer-based activity has supplanted family, social, and community life. Tyler grew up in a dysfunctional and chaotic household in the housing projects of Dundee, Scotland, and he found his escape by withdrawing into his bedroom and his computer for hours on end. The pattern compounded over years. His technical skill advanced at a rapid pace while his social development

remained stunted, and the offense conduct now before the Court is the end point of that divergence.

The United States Probation Office has prepared a Presentence Investigation Report (the "PSR") that summarizes Tyler's background with thoroughness and insight. Weighing the totality of the factors, the Probation Office recommends an aggregate sentence of 66 months: 42 months on Count 1 — a variance of 21 months from the advisory guideline range as the USPO calculates it on that count — followed by the mandatory 24-month consecutive term on Count 3.

Tyler Buchanan, through counsel, concurs in the Probation Office's reasoning and asks the Court to carry it one step further — to 37 months on Count 1 and 61 months in the aggregate — principally in light of the Sentencing Commission's amendment to the Loss Table, effective November 1, 2026 (Section III). In explaining the recommended 21-month variance, the Probation Office identifies several mitigating factors bearing on the history and characteristics of the defendant that the guidelines do not adequately capture (PSR ¶ 125). These include:

- his youth at the time of the offense — he was nineteen and twenty years old;
- a history of social isolation and maladaptive reliance on computers and online activity beginning early in his development;
- untreated anxiety;
- substance abuse; and
- his status as a first-time, non-violent offender.

In the Recommendation Letter that accompanies the PSR, the Probation Officer discusses these circumstances in more detail[1]:

> Buchanan was raised in a home marked by financial instability, domestic violence, limited parental supervision, and increasing social isolation. From an early age, he withdrew into computers and online gaming, and

[1] See Pages 7-8 of Probation Letter dated August 18, 2026.

> by adolescence, much of his social interaction occurred exclusively online. As he entered young adulthood, this pattern was accompanied by compulsive gambling, substance abuse, disrupted sleep, anxiety, and limited conventional social and occupational functioning.
>
> Buchanan has never received formal treatment for his anxiety, depression, gambling, or substance abuse issues. These needs appear particularly relevant to his rehabilitation and future adjustment.
>
> Buchanan also has educational and technical abilities that may support lawful employment upon release. He completed high school and later obtained a certificate related to computer science and game development. Although he has little conventional employment history, his technical skills appear substantial and could potentially be redirected toward lawful and productive employment with appropriate structure, treatment, and supervision.

The Probation Officer further observes that the defendant:

> …has expressed remorse for the instant offense and acknowledged the harm caused to the victims. Buchanan recognizes that conduct which had previously seemed remote and abstract while committed through a computer had serious consequences for real victims. …he has been separated from his family in Scotland. The approximate 11 months spent incarcerated abroad, in addition to his continued federal detention, represents a significant punitive experience for a young, first-time offender.

Those eleven months in Spain bear on this sentence in two distinct ways, and the defense does not ask the Court to count either one twice. The time itself is creditable against Tyler's sentence under 18 U.S.C. § 3585(b), a computation the law assigns to the Bureau of Prisons and applies to every federal defendant detained before sentencing. The conditions under which Tyler served that time — in a foreign prison, awaiting extradition, with only one visit from his family in eleven months — are a different matter. The credit does not reach them. Only this Court can weigh them, and § 3553(a) directs it to. Section V addresses both.

To gain further understanding into Tyler's personality and level of functioning, he was referred to forensic psychologist Jeffrey W. Whiting, Ph.D. for comprehensive evaluation. Dr. Whiting's findings regarding the psychosocial factors that shaped Tyler are consistent with the narrative outlined by the Probation Office. Additionally, he offers a recommendation for treatment. *See* Exhibit A, Report of Dr. Jeffrey Whiting ("Whiting Report").

As the Probation Officer observes, more than five years of imprisonment is a substantial shock to the system for a young man who has never before been confined. The family members who have remained in contact with Tyler uniformly describe this experience as an eye-opener for him. He has worked to make the most of the opportunities available to him in custody, and he has begun to give serious thought to his employment, career, and educational options upon release. Specifically regarding deterrence, the record reflects that Tyler has already absorbed a lesson far harsher than any sentence could impose. In February 2023, slightly more than a year before his arrest, he survived a home invasion in which machete-wielding robbers assaulted him and burned him with a blow torch, inflicting painful injuries that required hospitalization (PSR ¶¶ 79–80). That ordeal, in which he could have lost his life, together with the incarceration he is now serving, has left an indelible impression on him. The Court can be confident that the deterrent message has already been delivered and received, loudly and clearly.

For these reasons, and on the further grounds set forth in this Memorandum and its exhibits, Tyler Buchanan respectfully requests that the Court impose a sentence of 61 months' incarceration, five months below the Probation Office's recommendation, reflecting the Sentencing Commission's amended Loss Table. Such a sentence is "sufficient, but not greater than necessary," to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), including the need for just punishment.

## II.

## ACCEPTANCE OF RESPONSIBILITY

In his handwritten letter to the Court, Tyler Buchanan states:

> I accept full responsibility and understand that the crimes I committed come with serious consequences.
>
> I want to apologize for all the financial and emotional harm I have caused those affected by my actions. None of these people deserved to be victimized and robbed for their hard earned money. I know I can't make up for the traumatizing experience I have put these people through and I am so sorry for that….
>
> In the past 2 years in prison I noticed problems from the past and made efforts to improve upon them. I have been reading a lot and trying to better myself. I realize I had spent my entire life escaping on the computer and disconnected from the real world. I know that I was trying to escape all of the fighting around me and being online I could shut out everything. Being online made me feel safe and I was not in reality. There is no excuse for what I've done and I am facing the hard reality now. This is the first time in my life I am away from the online world and the people I met on there. I have changed a lot just by having to live without being able to escape into my computer. I have had lots of time to think about everything that led up to this moment. I do not wish to continue down the path I was on. I wish to be a better person moving forward.
>
> *See* Exhibit B, Letter to the Court ("Letter").

The family members with whom he speaks by phone from MDC – LA have noticed Tyler's contrition and his shift in perspective, starting with his mother Gaynor Andrews who writes:

> I am aware life hadn't always dealt the best cards for Tyler. I have so many regrets now. I think a lot of Tyler's true personality got lost because of his isolation and spending all of his time on computers and gaming…
>
> What Tyler did is very serious. More serious than I think he ever understood before. But he certainly understands now. I speak with him almost every day and he has expressed his remorse and feels terrible about hurting people. It is something he will have to live with forever.

> It breaks my heart that he is so young and has so much potential. I look back now and have so much guilt for allowing him to get lost from such young age. He needed me to pay more attention and to parent him and I failed to do so. His father was volatile and our homelife made everything worse, made Tyler want to disappear. He was such a sweet quiet boy and was left to his own devices. He is an adult now and has to be accountable, but his troubles started when he was just a wee child. Tyler takes responsibility and tells me not to blame myself…. [He] has learned some very hard lessons.
>
> *See* Exhibit C, Letters of Support ("Support Letters").

## III.

## COMMENTS ON THE ADVISORY GUIDELINES

The Defendant, through undersigned counsel, has no objections to the factual content or guideline computations in the Presentence Report, which yield a Total Offense Level of 26 and an advisory guideline range of 63–78 months on Count 1. The defense asks the Court to proceed in three steps: (1) calculate the advisory range under the Guidelines Manual in effect on the date of sentencing, as the Presentence Report does; (2) vary downward to the range that results under the amended Loss Table — a +18 rather than +20 increase for loss amount, yielding a Total Offense Level of 24 and a range of 51–63 months; and (3) vary further to 37 months on Count 1, for the § 3553(a) reasons the Probation Office and this Memorandum identify, resulting in a 61-month total sentence. The range under the amended Loss Table is as follows:

| | |
|---|---|
| Base Offense Level [§§2X1.1, 2B1.1] | 7 |
| Specific Offense Characteristics: | |
| More than $5 Million [§2B1.1(b)(1)(J)][2] | +18 |
| Number of Victims [§2B1.1(b)(2)(A)] | +2 |
| Sophisticated Means [§2B1.1(b)(10)(C)] | +2 |

[2] This is based on the guideline amendment scheduled to take effect on November 1, 2026.

| | |
|---|---|
| Timely Acceptance of Responsibility [§3E1.1(a) & (b)] | -3 |
| Zero-Point Offender [§4C1.1(a)] | -2 |
| ------------------------------------------------------------------------ | |
| Total Offense Level | 24 |
| Criminal History Category | I |
| Range Under Amended Loss Table | 51-63 months |
| Requested Downward Variance (3 Levels) to: | 37-46 months |
| Requested Aggregate Sentence (incorporating 24-Month Consecutive Term pursuant to 18 U.S.C. §1028A(a)(1) | ***61 months*** |

Measured against the 63–78 month range under the current Guidelines Manual, a 37-month term on Count 1 is a variance of 26 months — five months beyond the 21-month variance the Probation Office recommends. Measured against the 51–63 month range under the amended Loss Table, it is a three-level variance, to the low end of the resulting 37–46 month range.

The Plea Agreement which was filed with this Court on March 17, 2026 envisioned the defendant arguing for a loss amount between $3.5 million to $9.5 million, equating to an increase of +18 under the Loss Table at §2B1.1(b)(1)(J), while the Government intended to seek an increase of +20 for a loss amount of greater than $9.5 million under §2B1.1(b)(1)(K). In fact, the Probation Officer has determined the total amount of loss to be $14,547,163.52 which, at this point, neither the Government nor the Defendant disputes.

In the interim, the United States Sentencing Commission has submitted to Congress, pursuant to 28 U.S.C. § 994(p), a proposed amendment that will recalibrate the Loss Table to account for inflation. The amendment adjusts the monetary tables in the guidelines by applying a multiplier derived from the Bureau of Labor Statistics' Consumer Price Index, together with a set of rules extrapolated from the inflation-adjustment provisions of § 5(a) of the Federal Civil Penalties

Inflation Adjustment Act of 1990. That is the same methodology the Commission employed when it last adjusted the Loss Table amounts for inflation, in 2015, eleven years ago. Absent disapproval by Congress within the period prescribed by § 994(p), the amendment will take effect on November 1, 2026.

Under the amended Loss Table, $14,547,163.52 falls within the 18-level enhancement (greater than $5 million but less than $15 million) rather than the present 20-level enhancement. Because the amendment does not take effect until November 1, 2026, after the currently scheduled sentencing hearing, the Court will calculate the advisory range under the Guidelines Manual in effect on the date of sentencing. *See* 18 U.S.C. § 3553(a)(4)(A)(ii). The amendment is not controlling. It is, however, instructive. It reflects the Sentencing Commission's considered assessment that, once adjusted for inflation, a loss of the magnitude attributable to the Defendant warrants two fewer offense levels than the current table assigns — and it is the Commission's own judgment that the existing table overstates the seriousness of this quantum of loss.

In the eleven years since the Commission last adjusted the Loss Table, in 2015, prices have risen by roughly 36 percent — the 1.36 multiplier the Commission itself applied in calculating the amendment. Periodic adjustment of the Loss Table is therefore not a housekeeping measure but a necessity. Left unadjusted, the table's fixed dollar thresholds grow steadily more punitive on their own, and defendants face ever-steepening sentences for offenses involving progressively smaller sums in real terms.

## IV.

## DEFENDANT TYLER BUCHANAN'S PERSONAL HISTORY AND CHARACTERISTICS OFFER COMPELLING GROUNDS FOR A BELOW GUIDELINES SENTENCE

A sentencing court must give consideration to the advisory Guidelines, but *Booker* makes equally clear that the court may tailor the sentence in light of the other

statutory concerns Congress identified. *United States v. Booker*, 543 U.S. 220, 245–46 (2005).

Congress, the federal courts, and the United States Sentencing Commission have each recognized that 18 U.S.C. § 3553(a) lies at the heart of the sentencing determination. A faithful analysis of those factors — particularly the purposes of punishment and the parsimony principle, which directs the district court to impose a sentence "sufficient, but not greater than necessary," to comply with the goals of sentencing — must include the discretion to consider intervening facts and intervening law.

The Supreme Court has treated § 3553(a) as the touchstone of the federal sentencing determination. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Court has likewise reaffirmed that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Underlying that tradition is the principle that "the punishment should fit the offender and not merely the crime." *Id.* at 488 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). And the Court has emphasized that "[h]ighly relevant — if not essential — to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams*, 337 U.S. at 247.

Consistent with that authority, and with the instruction of 18 U.S.C. § 3661 that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," the following social history is submitted for the Court's consideration.

///

**A. General Family Background**

Tyler's parents, Robert Buchanan, 47, and Gaynor Andrews, 43, grew up in different towns in the Scottish Lowlands. Gaynor was the youngest of four children raised by a single mother who struggled with alcoholism and lived on government assistance. Robert was the second child of working-class parents. The two met at a party in Dundee, Scotland, when Robert was twenty and Gaynor was sixteen. Robert already had a two-year-old son, Connor, from a previous relationship. Connor is now 29, and Tyler's younger sister, Sara, is 20. Robert and Gaynor never married, but they sustained a long relationship and raised their children together until they separated when Tyler was sixteen.

**B. Childhood**

Tyler was born in Dundee on March 24, 2002. His parents were then unemployed and living with Gaynor's mother, and they soon moved into a two-bedroom apartment in a public housing project. When Tyler was two, Gaynor began working as a caregiver in facilities for the elderly while Robert stayed home with the children. Robert was a chronic marijuana user who often slept through his days and worked only occasionally.

Family members report that Robert spent most of his waking hours at the computer. As a young toddler, Tyler became fixated on it and would ask to join his father. That was the principal way the two of them bonded. Around the same period, Tyler's half-brother Connor, five years his senior, came to live with the family full-time; Connor's mother had a drug habit and had ceased to be involved in his life. The household had no kitchen table at which to share meals, so the family ate in front of the television or in separate rooms. Gaynor typically worked twelve-hour shifts, and during those hours the children were left in the care of their father or their grandparents.

Tyler's younger sister, Sara, was born in 2005. About two years later, when Tyler was five, his maternal cousin Dylan, then seven, moved in. Social workers had advised Gaynor that Dylan would be placed in foster care unless she agreed to take him, his parents' drug addiction having left them unable to care for him. Gaynor acquiesced, but

Dylan's arrival taxed her and the rest of the family. He had been through a great deal and was troubled. He threw tantrums, hit Gaynor and Tyler, soiled himself, and was frequently sent home from school for disruptive behavior. His presence compounded the tension already present in Tyler's home. In an interview conducted in preparation of this memorandum, Gaynor recalled:

> Robert had no patience to begin with but once Dylan came, everything got worse. We were all stuck in this small space together. Robert had a short fuse…a lot of rage. I was trying to manage things and look after the children. We were all on eggshells with Robert. He would boss me around. It was really mental torture and I can only imagine the effect it had on the kids. He'd throw things at me and break things. He smoked so much marijuana, we'd all get contact highs. The best I could hope for from Robert was that he'd just stay on his computer in his bedroom. He'd sleep a lot during the day, and everyone knew not to disturb him. He was like that with everyone. Tyler was a quiet kid who wanted to avoid trouble. There was a computer in the living room that Tyler would spend time on and apart from that he would just stay out of everything.

By age six, Tyler was preoccupied with being on the computer and playing video games on his brother Connor's console. This was the beginning of Tyler's retreat to fictitious worlds to avoid engaging with his volatile environment. Family members have also described Tyler as pleasant, kind, and curious, while at the same time reticent. A teacher's comment on Tyler's 2007/2008 school report card corroborates their descriptions:

> Tyler is well behaved and has maintained good progress in all areas of the curriculum. However, Tyler is very quiet and often quite shy and needs to be encouraged to have confidence in his own abilities. He does have a very positive attitude toward his learning, though, and always gives his best effort…
>
> *See* Exhibit D, School Records ("School Records").

By this time, Tyler was already exhibiting not only an affinity for computers, but also a lack of social skills. He had a pleasant disposition and didn't assert himself with others. In her attached letter, his cousin Kelly Tarbett recounts:

> Tyler was a loving caring child but was always withdrawn and enjoyed alone time and preferred independent activities rather than group. I had often said to Gaynor that Tyler showed ASD (autism spectrum disorder) traits. I am a support practitioner for adults and children with learning disabilities and a lot of Tyler's behavior's and traits often mimicked those of people I have supported over the years, his hyper fixation on computers and electronics and his ability and knowledge from a young age, his lack of wanting social interaction and need to be isolated and preferring to be alone. Tyler was an anxious child and the household was often chaotic with 3 other children in the house. For most of his childhood his parents lived in a 2 bed flat and space was sparse. As you can imagine everyone was on top of one another and Tyler often found the household overwhelming and preferred to seclude himself in his games. Gaynor & Robert (mum and dad) often argued and their relationship was never stable…
>
> Exhibit C, Support Letters.

When Tyler was about nine, social services moved the family to a larger unit within public housing. The move was made to accommodate Dylan, whose arrival had left the household short of space. In the new four-bedroom flat, Sara and Connor each received a room of their own. Tyler continued to share with Dylan.

That arrangement reflected the shape of the household more broadly. Dylan had arrived with significant needs, and those needs absorbed what attention the adults had to give. Tyler, who asked for little and caused no difficulty, received correspondingly little. The two boys never grew close, though they spent hours side by side playing video games — *Grand Theft Auto* and *Call of Duty* among them, both rated for players eighteen and older. That a nine-year-old had unsupervised access to that material is less notable for its content than for what it reveals: no adult was tracking what Tyler was doing, or for how long.

As the boys grew older, their paths diverged. Dylan spent less and less time at home, roaming the streets and drawing adult attention through drinking, setting fires, and fighting. Tyler went the other way, inward, into his room and into his devices. His grades held steady, and that steadiness masked the problem. A child who is failing gets noticed; a quiet child with good marks and no friends does not. No one intervened, because on paper there was nothing to intervene in.

**C. Adolescence**

Tyler's family struggled financially and could not afford many indulgences. Digital devices and related products were the exception, the only splurges, given as gifts for birthdays and holidays. When Tyler was twelve, he received his own laptop computer for his birthday. The thrill of it was the access: the machine was his, and his use of it was unlimited. He would put on his headset, shut out everything around him, and explore the vast universe of new games open to him.

Tyler withdrew further. He barely left the house except to go to school. In her letter, his grandmother, Nan, recalls this period as the time she felt she was losing her grandson. She writes:

> As Tyler got older he stopped coming with grandad, preferring to stay in his room with his play station playing Minecraft and grande theft auto etc. I can't remember a time when Tyler was out with friends as he spent longer and longer on his computer until he had completely withdrawn himself from any kind of outings. We missed Tyler coming to stay of course but on the odd occasion he did come he was miserable or would hide away upstairs because he wasn't on his computer playing games and chatting to his "new friends." He was on his computer so much that he started talking with an American accent, you wouldn't have known he was a Dundee lad at all… Mum and Dad too busy with their Arguments to notice just how much their son was changing.
>
> Exhibit C, Support Letters.

The family lived in public housing in an economically depressed area where drug use and violence were features of daily life on the streets outside. For a parent,

the calculus in such a neighborhood is straightforward: a child at home is a child who is safe. Gaynor was relieved that Tyler preferred his computer to the street. She knew where he was. She also assumed she knew what he was doing.

Inside the home, the demands on her attention were absolute. Dylan had been diagnosed with ADHD, and managing him consumed her -- locating him when he disappeared, and pursuing services that were slow to materialize. His outbursts were violent: kicking, punching, striking his head against the wall. Robert met these episodes with anger of his own, and Gaynor was left to stand between them.

Tyler's response was to disappear in place. He had no appetite for the dangers outside and little to draw him out of his room, so he went inward instead, into a screen that offered adventure, companionship, and above all quiet. By the standards of the house he was living in, what he found there was an improvement. It was also unobserved. He spent hours at a stretch alone in his room, and no one in the household knew what he was looking at or, more consequentially, who was speaking to him. By his early teens, Tyler had gained a significant amount of weight as his life grew more sedentary. The weight drew teasing at school, which deepened his preference for online contact over the in-person kind.

When Tyler was fourteen, his younger sister Sara began suffering from disturbing symptoms, waking several times a night in pain and requiring more of Gaynor's care and attention. After extensive testing, Sara was diagnosed with Type-1 diabetes. She had bouts of dangerous insulin dips, one so severe it plunged her into a coma that lasted for a day and a half and carried the risk of brain damage or death. After her recovery, over the course of several months, doctors were able to prescribe appropriate medications. This frightening event should have been unifying for the family; but Gaynor's necessary preoccupations with Dylan and Sara, Robert's overt hostility, and Tyler's inability to communicate his concerns for his sister led to an even more fragmented and stressful climate at home.

When Connor moved out, Tyler had a bedroom to himself for the first time. He was by then fully immersed in Minecraft, and the strangers he played with -- people he had never met, scattered across the world -- had become the closest relationships in his life. At school he was a target. Online he was someone else: quick, capable, able to trade barbs and hold his own. He poured every hour and every ounce of effort into developing his skill at these games, and that aptitude bought him the one thing school did not offer, which was standing among peers.

The environment he had entered, however, was not a children's playground. Tyler was threatened. Malware was installed on his machine. Other players demonstrated that they could reach into his home network and cut his internet off at will. A teenager with no adult to turn to and no way to make it stop, Tyler did what the culture around him modeled: he learned to do the same thing back.

The forums he now belonged to were not populated by children alone. Adults moved freely in these spaces, and what circulated there was instruction — how to obtain stolen credit card numbers to purchase "skins" and other add-ons, how to gain advantage in games through unauthorized access, how to convert virtual items into real money. Tyler was introduced to online gambling sites as well, which he was years too young to use lawfully. He absorbed all of it, as a fourteen-year-old absorbs whatever the older people around him treat as ordinary.

The contrast with Dylan is worth stating plainly. Dylan was on the streets, visibly in trouble, and the adults in his life responded accordingly. Tyler was in his bedroom with the door closed, and by every measure available to his parents he was the child causing no concern. He was, in fact, being taught — patiently, by adults, over a period of years — that unauthorized access and fraud were routine features of the world he lived in. What made that possible was not that anyone approved of it. It was that no one was looking.

Academically, Tyler moved through high school without engaging with it. His mother recalls that getting him to attend could be a struggle, though he generally went

and his grades were adequate. He found the work both dull and undemanding, and what he looked forward to each day was the afternoon — returning home to his games and to the gambling sites. His mother and grandmother are consistent on this point: in all those years, Tyler never had a friend to the house and never went to anyone else's. The people he sat beside in class were acquaintances. The people he considered friends were online.

As is customary in Scotland, Tyler completed secondary school at sixteen and enrolled at Dundee & Angus College. His parents separated shortly afterward. His mother left the family home with Tyler, Sara, and Dylan and entered emergency housing for women who had experienced domestic abuse. The shelter had no reliable internet, and within a short time Tyler returned to live with his father.

Whatever supervision his mother had managed — and it was limited — ended at that point. Robert was using drugs and was not attending to Tyler in any respect, and no one remained to ask how he spent his time. He stayed online through the night, going to sleep around nine in the morning, waking at six in the evening, and beginning again. He lived on soda, frozen meals, sausages, and fries, and his weight climbed further. For a time he kept attending classes at the college, but when the pandemic moved the coursework online he stopped engaging with it altogether. He did obtain a certificate in Game Development, though he regarded it as teaching him less than he had already taught himself. The pandemic removed what little reason remained for him to leave the house at all.

**D. Young Adulthood**

At the women's shelter Tyler's mother received therapy, began taking medications for depression, and was helped to move into a new public housing unit. Tyler moved back in with her and continued to indulge his online addictions. He would occasionally spend time at his father's as well, staying up all night on the computer. In his sleep-deprived state, he struggled with anxiety and began hearing voices. He purchased Xanax online and would take four or five pills a day seeking

to quell his anxiety. Tyler had initially tried marijuana at fifteen and "didn't like it" at first. But two years later he took it up again and by nineteen, his usage had escalated to smoking "five or six joints a day." He reports that marijuana and Xanax helped deal with mounting stress from his increased gambling on third party websites.

People who Tyler had come to know were starting to get involved with "sim-swapping." They would pay him to do tasks for them, for example, find a phone number for five hundred dollars. After making a little money, he began to gamble, at first small amounts: twenty dollars, then fifty dollars. He became addicted to the thrill of winning, but as usually happens, most of the time he lost. He would win big sometimes, just to lose it all back over a short period of time.

In 2022, Tyler moved into an apartment he shared with a roommate in Dundee. His mother believed he was making legitimate money applying his computer skills and acumen. She was encouraged by his independence and the appearance that he was successful. Tyler helped his mother pay her debts and bills, and he maintained a positive relationship with her and Sara. In contrast, the men in his family didn't make much effort to have a relationship with Tyler beyond serving their own interests. He recalls that after he moved out on his own, the only times he heard from his father or Connor or Dylan was when they would ask him for money. He mostly stopped talking to them.

**E. Home Invasion Robbery and Aftermath**

On February 19, 2023, Tyler was in the apartment he shared with his roommate when he heard a knock at the door. Through the peephole he saw two men dressed as electricians or construction workers. As he opened the door, they forced their way past him. One carried a machete and held it to Tyler's neck. His roommate was bound with zip ties. The men made Tyler turn on his computer, and then burned his arms and legs with a blowtorch in several places; he still bears visible scars on his wrist and leg. Using a small disposable cell phone, they placed a call, and then

directed Tyler to transfer a large sum of bitcoin. They burned him again as they tried to extract more. The episode lasted perhaps ten minutes, though to Tyler it seemed far longer, and then the men relented and left.

Tyler freed his roommate, who went to his parents' home. Tyler went to a hotel and tried to treat the burns himself. Over several days the wounds worsened and the pain became unmanageable, and he ultimately went to a hospital, where he was treated and remained for roughly a week and a half. He did not report the assault to the police, for reasons the circumstances make apparent. Nor did he tell his mother, wanting to spare her the alarm.

Afraid to return to his apartment, Tyler stayed in hotels and short-term rentals. On March 10 he traveled to Canada, where he remained about a month, then returned to Scotland for two days before joining his family on a trip to Portugal. In April 2023, at the airport in Scotland and in his family's presence, he was arrested and his computers were seized. His understanding was that the arrest concerned a bank fraud matter in which he had no involvement; officers questioned him, found nothing, and released him. What he did not know was that the Scottish authorities had turned his computers, and the data on them, over to federal law enforcement in the United States.

Tyler continued on to Portugal and spent a week with his family, largely silent and on his phone. He returned to Scotland for a few days, then spent close to a year moving between temporary accommodations, eventually settling into an Airbnb in London. That restlessness was driven by fear. He believed the men who had tortured him could find him again, and he did not stay anywhere long enough to be found. He was smoking marijuana heavily throughout. Between June and December 2023 he was also taking Adderall purchased online, which kept him awake for days at a stretch. His weight collapsed during this period, falling from roughly 280 pounds to approximately 180. Through all of it he continued to gamble online, which he

describes as a compulsion he could neither control nor interrupt, and which produced acute anxiety whenever he was unable to engage in it.

In May 2024, Tyler was arrested in Spain, where he was held for approximately eleven months pending extradition to the United States. The conditions of that confinement, and their significance to sentencing, are addressed in Section V.

**F. Psychological Considerations**

Tyler was referred for comprehensive psychological assessment to Jeffrey W. Whiting, Ph.D. Dr. Whiting interviewed him at the Metropolitan Detention Center – Los Angeles on four occasions for a total of eleven hours and conducted testing. He has prepared a detailed report that explores the psychosocial factors which influenced Tyler's development and decision-making. Exhibit A, Whiting Report.

Dr. Whiting describes Tyler's childhood home as "characterized by poverty, since neither parent consistently worked, and a high degree of emotional turmoil mainly attributed to Robert yelling and screaming at the rest of the family." From that starting point, Dr. Whiting traces Tyler's response:

> As he progressed into his teen years, Tyler developed a pattern of escapism by spending hours on the computer. With his headset that shut out the noise of the household, he could be anywhere but present in the home, while never physically going anywhere. He reports that he preferred this solitary activity over interactions with family members, other kids in the neighborhood, and schoolmates. Some of his peers made fun of his weight, so this experience reinforced not engaging in the real world of relationships….
>
> When Tyler was asked about his parents, and their reaction to his isolation and computer obsession, he said that he got the impression that it did not bother them. He thought it might have actually been a relief for them that they had one less kid they had to worry about. When Tyler was asked if, at the time, he ever thought he was missing something, he said that he felt calmer and more engaged when he had unlimited access to the computer, and that it

> never dawned on him that there could be a disadvantage. He reports that his computer activity provided him with ample problem-solving challenges, and this made him focused. Any of the trouble within his family home, at school, or in the neighborhood, could be blotted out when he was immersed in his computer. …He states that he was playing games with people "from all over the world", and he found it easier and less stressful to have conversations with these "friends" online than people in the real world.
>
> Exhibit A, Whiting Report.

Dr. Whiting notes that it was the unfettered access to these individuals who befriended Tyler that led to the illegal activity for which he has pleaded guilty. An additional exacerbating factor was his increasing reliance on marijuana, Adderall and other substances. Dr. Whiting assesses:

> Gaming disorder is not a fully recognized diagnosis in the current DSM. I am confident it will appear in the next revision. The research literature and clinical practice of the last two decades point to something approaching an epidemic, and the risk to children is plain: the activity can become addictive after comparatively little exposure. A child who is not closely supervised can lose his developmental years to a virtual world — never learning to interact with people in person, delaying or permanently stunting his acquisition of social skills, and relying on a computer, and only a computer, to soothe and regulate himself emotionally. That, in my assessment, is where Tyler Buchanan's path to his present circumstances began.
>
> …Tyler Buchanan's offense conduct grew out of a childhood in which his way of engaging the world was forged as an escape. What he was escaping was frightening, demeaning, and without prospect. What he escaped into was a virtual world where friends were easy to acquire, consequences were imaginary, and rewards came without cost…. There was no meaningful parental supervision, no guidance toward pro-social experience, nothing to interdict a descent that should have been obvious to any attentive adult.
>
> *Id.*

With respect to Tyler's prospects to overcome his early stumbles and resurrect a healthy life going forward, Dr. Whiting posits:

> Tyler is young. He was 22 at his arrest, and my assessment is that his personality functioning corresponds to that of a young adolescent — precisely the age at which his addiction to the computer began. A second addiction followed, one whose effects are well documented: cannabis use in a developing brain impairs acquisition of several capacities essential to the transition into adulthood. Development stalled; it did not end. Male brain development continues into the mid-to-late twenties, and a substantial research literature indicates that even long-term adolescent and young-adult cannabis users can acquire and master delayed developmental tasks once sobriety is achieved and sustained. Abstinence from gaming and gambling would contribute independently, by removing the distraction of fantasy and manufactured risk from the work of living an actual life. If Tyler can maintain sobriety across all three, maturation will do much of the work on its own. It is not too late for him to catch up.
>
> Tyler Buchanan needs treatment. The initial focus should be sustaining the remission of his addictions, which his detention has substantially assisted. Beyond that, he requires both individual and group psychotherapy. The case for group work is straightforward: Tyler needs to learn how to be around real people, in person. …Living in the real world is hard. Stealing in a world experienced as imaginary is not a solution to that, because the consequences are real. A medication consultation to address his depression and anxiety would be essential…. In my clinical experience, individuals who commit this category of offense share a common history: they were badly injured emotionally in their youth, and the injury was never identified or treated. Addressing it is what removes the foundation the offense was built on.
>
> *Id.*

Recent years have brought encouraging developments in the protection of children and adolescents drawn into excessive online gaming. Authorities and researchers increasingly recognize the need for early intervention to interrupt the progression from gaming to cybercrime. They also recognize that many of these adolescents possess unusual technical insight into the methods by which cybercrime

is committed, and that if they are identified before they go too far, that insight can be redirected toward preventing it.[3]

Kevin Mitnick is the best-known illustration. Prosecuted in the Central District of California for computer and wire fraud, Mitnick pleaded guilty in 1999 and spent roughly five years in federal custody. After his release he built a career in the field his conduct had once exploited, founding a security consulting practice, advising companies on the vulnerabilities he understood better than most, and becoming one of the most widely recognized figures in the profession until his death in 2023.

Tyler is an intelligent and gifted young man who hopes one day to put his own skills to comparable use in helping to thwart cyberfraud. He regrets that he did not conceive of or recognize that pathway sooner. The study and attention now being devoted to the gaming-to-criminality pipeline came too late to intervene in his case. They need not come too late for him. A sentence that accounts for how Tyler arrived here, and that preserves his capacity to redirect what he knows, serves the purposes of 18 U.S.C. § 3553(a) more fully than one that does not.

As noted in "Pathways to Criminal Hacking: Connecting Lived Experiences with Theoretical Explanations"[4] (published in *Forensic Sciences*):

> Notably, the current study found that young males who are curious and creative in childhood, experience destabilizing events, and develop an early interest in technology are well placed to follow the pathway to criminal hacking behavior. Online gaming was identified as a possible gateway to criminal hacking activities. A sense of overcoming a challenge, being elite, and having "control over the machine" encourages youth to continue criminal hacking activities.
>
> …Building upon the pathways identified in extant research, the current study identified the importance of

[3] https://directionforbedfordshire.co.uk/wp-content/uploads/2019/06/CREST-NCA-Cyber-Crime-Report.pdf

[4] https://www.mdpi.com/2673-6756/4/4/45

> destabilizing events in the life of young hackers. These events often create a context in which online spaces become a sort of sanctuary. While young hackers navigate to spaces online where they can meet like-minded others, it appears that hacking behavior is generally initiated through self-directed learning and as a solitary pursuit. The current study also counters the common perception that hacking is primarily a financial crime. Curiosity, challenge, and a sense of mastery and control over the machine appear to be more common primary motivations for initial hacking behaviors. Financial motive appears to be secondary or tertiary and better explains the continuation of hacking behavior than its initiation. Early on the pathway, many participants elicited a desire to utilize their technical ingenuity for prosocial purposes. This suggests that effective prevention efforts should target younger youth (i.e., age 8 to 12 years), provide interesting technical challenges, and remove obstacles to a career path in cyber security…. Diversion programs for first-time offenders may provide an effective means of moving technically skilled youth off the pathway to more serious cyber offenses and toward a career in cyber security. …It is hoped that the findings of this study will help inform novel cybercrime prevention and deterrence efforts.

## V.

## INCARCERATION IN SPAIN: CREDIT FOR THE TIME, AND SEPARATE CONSIDERATION OF THE CONDITIONS

### A. Credit for the Time Served in Spain

On or about May 31, 2024, Tyler was arrested in Spain where he was placed in custody solely on the basis of a provisional arrest warrant issued at the request of the United States in this matter, and thereafter on a formal extradition request in the same matter. He remained continuously in custody in Spain — for approximately three weeks at Centro Penitenciario Madrid III in Valdemoro, and thereafter at Centro Penitenciario de Palma de Mallorca[5] — until he was transferred to the

[5] Spain does not maintain separate institutions for pretrial and post-conviction custody as the United States does; both are held within the same type of facility, denominated a "centro penitenciario" (penitentiary center) under Spain's Secretaría General de Instituciones Penitenciarias, with pretrial and sentenced inmates ordinarily separated only by module within a single institution. Tyler's custody in Spain was, throughout, pretrial detention pending extradition; the institutions themselves are properly described as prisons or

custody of the United States Marshals Service on or about April 22, 2025. He was not held in Spain on any other charge or prosecution, and that period of detention has not been credited against any other sentence.

Because the entirety of that detention is attributable to this prosecution, the defense respectfully requests that the Court find, as a matter of fact, that Tyler has been in continuous custody on this matter since May 31, 2024, and that the Court recommend that the Bureau of Prisons credit that period against his sentence pursuant to 18 U.S.C. § 3585(b). Because the computation of that credit rests with the Bureau of Prisons rather than the sentencing court, *see United States v. Wilson*, 503 U.S. 329, 333–35 (1992), a finding on the record as to the dates and sole basis of the Spanish detention will ensure the Bureau has what it needs to apply it.

**B. The Conditions of That Confinement Are a Separate § 3553(a) Factor, and Weighing Them Is Not Double Counting**

Section 3585(b) credit and the downward variance recommended by the Probation Office answer different questions. The credit measures how long Tyler has been in custody. The variance weighs what that custody was. The first is arithmetic: a statutory computation, committed to the Bureau of Prisons, that treats every day of official detention as interchangeable and applies identically to every federal defendant. The second is judgment, committed to this Court under § 3553(a). The defense asks the Bureau to count the days and the Court to weigh them. That is not double counting. It is counting two different things, once each.

A month in custody is not a fixed unit of punishment. Its weight depends on where it is served and under what conditions. Section 3585(b) is blind to that difference by design. A day in a Spanish prison, held for a foreign sovereign pending extradition, is credited exactly as a day in a domestic federal facility within reach of family, counsel, and the courthouse. The credit places Tyler on equal

---

penitentiary facilities under Spanish law, notwithstanding that he had not been convicted of any offense during his confinement there.

footing with every defendant detained in the United States before sentencing. It does nothing to account for the ways his detention was harsher than theirs. That residual severity is what remains, and only this Court can address it.

The record on those conditions is stark. Tyler was twenty-two years old when he was taken into custody in Mallorca, Spain, a country wherein he had no ties and whose language he does not speak. He remained incarcerated in Spain for approximately eleven months. During that time, he received one visit (PSR ¶ 82). His family was in Scotland. The prosecution was in California. Tyler was held in between, awaiting the outcome of a foreign extradition proceeding he could not control, on a timeline no one could give him.

More importantly, for the entire eleven months, Tyler was effectively unrepresented in this case. Before the Spanish facility would authorize a call to an attorney, it required the lawyer to submit a signed contract and a passport photograph through a verification system; the process took approximately two weeks; and the facility opened authorized attorney-contact windows only four months out of the year. Tyler supplied the facility with his United States counsel's contact information and was never able to complete verification. On one occasion he borrowed another inmate's video-call access in order to reach an attorney; the call was cut off. He retained and paid for private Spanish counsel, but that engagement was confined to the Spanish extradition proceeding. Spanish counsel could not advise him about the charges in this District, the evidence supporting them, the Sentencing Guidelines, or any decision awaiting him on arrival. For eleven months the most consequential proceeding of Tyler's life was underway on another continent, and he could not communicate with counsel.

A single correctional officer at the Spanish prison spoke English during the entire time Tyler was held there. Roughly twelve to fifteen of the approximately one hundred inmates in his unit did. The facility never provided an official interpreter. Staff instead pulled other inmates to translate for him, on more than ten occasions.

During an intake call with Spanish counsel concerning the extradition, Tyler was required to communicate through a fellow inmate — a conversation that should have been privileged, conducted through a stranger held in custody alongside him.

Tyler was given no access to the discovery or evidence underlying the extradition request. When he asked the agent handling his case for the basis of the charges, he was told that he could not contest the facts and would not be shown the evidence; that a complaint existed; and that he could not challenge it until he reached the United States. For eleven months he was held on allegations he could neither see nor answer.

Temperatures at the prison facility reached approximately 40°C (104°F) inside the building as well as outside it, with no climate control. The cafeteria was infested with roaches. Cells were noisy and held two inmates. Tyler was confined to his cell seventeen of every twenty-four hours — locked down from 2:00 p.m. to 5:00 p.m., and again from 8:00 p.m. to 8:00 a.m.

Tyler received no treatment in Spain for the substance dependence, anxiety, or depression he arrived with. What he observed instead was a facility that dispensed psychiatric medication — antidepressants, diazepam, and methadone — through the inmate population, in his words, "like it was nothing," while responding to acute medical need unpredictably: staff declined to take an inmate with a broken foot to the hospital. He witnessed another inmate overdose.

In eleven months, Tyler received one visit. His mother and sister traveled from Scotland approximately a month before his extradition, near his birthday. He had discouraged them from coming sooner — he did not expect the detention to run as long as it did, and did not want them making that journey to sit with him for an hour. Tyler has described that visit as the point at which the reality of his situation set in, and its end as devastating.

These are not the ordinary hardships of pretrial detention. A defendant held in a domestic facility before sentencing has access to an attorney, telephones his

lawyer, reads his discovery, and confers with counsel in a private room. Tyler did none of those things for eleven months. He could not reach a United States attorney, was not shown the evidence against him, was told in terms that he could not contest it, and had no interpreter — the facility's answer to which was to route his communications, including a call with counsel, through another inmate. That is the difference § 3585(b) cannot see and this Court can. Tyler's incarceration in Spain was a complete mental devastation that inmates detained locally do not typically experience.

He arrived in that setting already fragile. His last use of a controlled substance was on May 28, 2024 — three days before his arrest (PSR ¶ 92). He had never received treatment for substance dependence, anxiety, or depression (PSR ¶¶ 87, 93). He had spent the preceding fifteen months moving between temporary accommodations, afraid that the men who held a machete to his neck and burned him with a blowtorch would find him again (PSR ¶¶ 79–80, 88). Whatever that abrupt cessation cost him physically, and whatever his tremendous fear became behind bars, Tyler confronted both in a foreign prison, untreated and alone.

Courts have long recognized that the conditions of presentence confinement, including confinement abroad pending extradition, may warrant a sentence below the advisory range. *See United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (per curiam) (holding that conditions of pre-extradition confinement in the Dominican Republic may support a downward departure, and remanding for the district court to consider them); *United States v. Pressley*, 345 F.3d 1205, 1218–19 (11th Cir. 2003) (recognizing that presentence confinement conditions may, in appropriate cases, support a downward departure); *United States v. Mateo*, 299 F. Supp. 2d 201, 211–12 (S.D.N.Y. 2004) (departing downward where misconduct by custodial officials during presentence confinement rendered the defendant's time in custody substantially more punitive than ordinary detention, in combination with

extraordinary family circumstances). Each of those decisions arose under the mandatory guidelines regime, when the court's authority was confined to departures.

After *Booker*, *Gall*, and *Pepper*, that authority is broader still. Section 3553(a)(1) and (a)(2)(A) direct the Court to consider the history and characteristics of the defendant and the need for just punishment, and 18 U.S.C. § 3661 forbids any limitation on the information the Court may consider in doing so. The punishment Tyler has already absorbed is part of that inquiry.

The Probation Office's own reasoning reflects the distinction. In recommending a somewhat greater variance for Tyler than for his co-defendants, the Probation Officer did not rest on the length of the Spanish detention alone. She emphasized its character: that Tyler has been "separated from his family in Scotland," and that his time "incarcerated abroad" represents "a significant punitive experience for a young, first-time offender." (Recommendation Letter at 8.) That is a judgment about the nature of the confinement, not a tally of its days.

Parity among the co-defendants points the same way. *See* 18 U.S.C. § 3553(a)(6). Any co-defendant detained in the United States before sentencing will receive § 3585(b) credit for that time as a matter of course. If Tyler receives the same credit and nothing more, eleven months in a Spanish prison, with one hour-long family visit and no attorney, will be treated as the equivalent of domestic pretrial detention. Crediting the time and weighing its conditions does not give Tyler more than his co-defendants. It keeps him from receiving less.

Accordingly, the defense respectfully requests that the Court (1) find that Tyler has been in continuous custody on this matter since May 31, 2024, solely on the basis of the United States' extradition request, and recommend that the Bureau of Prisons credit that period under 18 U.S.C. § 3585(b); and (2) in imposing a variance on Count 1, state on the record that the variance rests on the conditions and character of Tyler's Spanish confinement, together with the other § 3553(a) factors identified by the Probation Office, and not on the duration of that confinement,

which the Bureau will credit separately. A record that draws that line makes plain that each consideration has been counted once, and only once.

## VI.

## CONCLUSION

Tyler Buchanan is immensely ashamed of what he did and of the disappointment he has caused his family. He understands the scope of the harm he inflicted on his victims, and it disturbs him. What was abstract to him behind a screen — names on a list, numbers in a file — has been made concrete, and he has had to sit with the reality of conduct he now recognizes as seriously destructive.

Tyler has been in custody for more than two years, nearly eleven months of it in a Spanish prison facility. He has spent that time examining his own conduct and confronting his failures rather than explaining them away. He has talked through these years with the family members who have remained close to him, and he has worked to understand what drew him toward this conduct in the first place — not to excuse it, but because he does not intend to be a person who ever does it again.

Tyler and his family recognize how much of his life has been shaped by trauma, isolation, anxiety, addiction, the absence of physical and emotional safety, and the absence of any real friendship or romantic attachment. There is also reason to believe that with proper support, guidance, and treatment, Tyler will be able to build a meaningful life — a viable career, and a family of his own.

Tyler accepts that he alone is responsible for where he now finds himself. He offers no excuses for his conduct and does not seek to minimize it. What he has tried to do instead is understand how he arrived here. He knows he will be punished, and he does not dispute that he should be. What he asks for is the opportunity to obtain treatment — for his twin gaming and gambling compulsions in particular — and to build a workable plan for the years after his release: employment, stable housing, and a life conducted in the open rather than behind a screen.

With the foregoing in mind, Tyler respectfully submits that a sentence of 37 months on Count 1 and 24 months on Count 3, for a total of 61 months' imprisonment, is "sufficient, but not greater than necessary" to provide just punishment, afford adequate deterrence, protect the public, and ensure that this contrite, still-maturing young man receives the treatment he needs.

Dated: September 17, 2026

Respectfully submitted,
LAW OFFICE OF SARA AZARI

By *_/s/Sara Azari_*
SARA AZARI
Attorney for Defendant
TYLER BUCHANAN

LAW OFFICES OF VICTOR SHERMAN

By *_/s/Victor Sherman_*
VICTOR SHERMAN
Attorney for Defendant
TYLER BUCHANAN